and this honorable court. Please be seated. Good morning and welcome to the Ninth Circuit. Judge Bybee, Judge Forrest, and I are glad to have you here. We've been looking forward to this case with great anticipation. We would just like to remind you, I mean we've obviously extended the time. We hope that that will give everybody enough time to make the arguments that they need to make. We understand it's a fairly complicated case. Hopefully, you'll make it less complicated. That's the goal of oral arguments. So, but just watch your time. Let us know if you want rebuttal time and then I guess you would be entitled, because I think there's cross appeals, to serve rebuttal time. If you would like that, let us know. I know we have two counsel that's arguing and we'll give you each 15 minutes and then if you want to reserve any, each of you want to reserve any of that time, you can do so first to rebuttal. So, we will proceed with the only argument set for today, which is Kane versus PaCap Aviation Finance LLC. Case numbers 24-5683, 24-6024, 24-6026, 24-6290, and 24-6345. Good morning, your honors. May it please the court, I'm Nick Kaprowski. I represent the bankruptcy trustee, Elizabeth Kane, as well as the two union plaintiffs, in this association. I would like to reserve 12 minutes for rebuttal and response to the cross appeals. I want to begin by acknowledging that there are many points of error raised by the appellants and the cross appellants. This trial lasted five weeks and involved over 90 causes of actions. We are not asking for the findings of the court or the jury below to be disturbed on the vast majority of the causes of action. Rather, we are asking for a limited new trial on a small subset of the claims where either, one, issues or defendants were kept from the jury, two, critical evidence was kept from the jury, or three, the jury was improperly instructed. Unlike the OWL defendants, we are not asking this court to throw out any decision the jury made because the jury got it wrong. I want to start with what we've labeled issue number one, which is the jury instruction that we offered that the court refused to give on damages. Counsel, before you launch into the issues that you are going to discuss, I have a preliminary question, and that is, how do we have jurisdiction under section 1291 when there is less, there are things left to be done in this case? Yes, Your Honor. The the argument that there is no jurisdiction is that there are things left to be done because there were certain cross-claims that were dismissed without prejudice. But the dismissal without prejudice was to bring those claims in a different forum. And if you look at the cases that we've cited and the cases that they've cited, there are a number of cases, and in fact, it's the predominant rule that if a claim is dismissed without prejudice, then the case is final. Where the appellate court is concerned in the cases that they raised is where cases are dismissed without prejudice in such a way as to create appellate jurisdiction and to get piecemeal appeals. And frankly, it seems like there's an argument to be made that that's what happened here. I mean, the district court clearly thought that and intended to have a final decision in the sense of, like, she's done with this case and it's going somewhere else for any further activity. That's clear, but it's not clear that the claims that you're referencing where there was this dismissal without prejudice are actually done. And it seems like you could say that by issuing an order that said that, she was trying to create finality when finality actually just doesn't exist because there are lingering arguments and defenses that she's allowing to go forward in front of the bankruptcy court. And I don't know how that works under 1291 because we're, you know, if we were, if we had jurisdiction under 158, then this would be smooth sailing. But we're not under 158, we're under 1291, so I'm struggling to put all that together. Yeah, the reason I would disagree with you there is it would be one thing if it was dismissed without prejudice to refile in her court, in the district court before her, but this is to be to be adjudicated in another process, in a bankruptcy court process, which is really the appropriate place for adjudicating creditor claims. Yeah, what exactly remains to be decided? What didn't get decided below? Yes, what was not decided below where the unions at issue filed proofs of claim saying that they were owed money from the estate based on the Island Heirs violation of the Hawaii Dislocated Workers Act and the Warren Act. The district court dismissed those claims without prejudice, saying I'm not going to decide those claims in this case. Those are bankruptcy court proofs of claims. It should go to the bankruptcy court to adjudicate those claims. And by the way, there was testimony before me that those claims are moots because they were for the wrong numbers. They're going to be drawn and amended. So the claims in front of me as they stand are now moot anyway. So she dismissed it without prejudice to allow the bankruptcy court to decide those issues with a new filing of proofs of claims with the correct amounts. To give a little bit more background in case you want it, the proofs of claims are filed at the beginning of bankruptcy when a jury found unclear what the value of the claim is. This one involves statutory violations which had unique calculations of wages due. The unions did the best they can when they filed those proofs of claims, but then they hired an economic expert who testified at trial that did a pretty exact valuation of those claims and it was different. And the unions testified at trial that yes, we do need to withdraw those claims and amend them to comport with what the expert here has testified, which is what the jury found. So you were going to move on, you were going to start with the jury instruction. Correct. So here's my question on the jury instruction and just to tell you maybe it'll help frame your argument. It seems like what the district court said was technically correct in the jury instruction, but may have left out an another, you know, piece to this. And I'm trying to figure, you know, which is, I mean, she said you can't award by speculation or guesswork. That's a correct statement of the law, right? You can't award damages by speculation or guesswork, but this gets complicated because you can do it by reasonable estimate in this case. It doesn't have to be with precision. So what is your argument? Is your argument that the jury instruction on its face was incorrect or that it was misleading because it didn't capture the law correctly? Our argument is that there was a material omission as to the law from the jury instruction, which although the statements of the law in the jury instruction were correct, when you leave out the other statement that was not given, it renders the jury instruction as a whole, not the whole picture of where law, which thereby skewed the verdict. So it's both what we wanted was a appropriate instruction of another aspect of the law and... And you asked for that and she didn't include it? Yeah, we asked for that. It was at the jury instructions conference. I read out the statement. I said specifically, Your Honor, you're giving a very defense-friendly jury instruction. I cited cases saying this is what we want in here. I believe the record is clear that we put that forward. I don't have the sites in front of me, but I'm happy to provide them in rebuttal and I believe we have them in the briefing. And I think it's clear that it's material just as a matter of common sense, particularly in a case as complex as this one that involved intricate details of accounting and four different experts on damages just on the fiduciary duty claims. I'd also point out this is a de novo standard of review. The instruction that we asked for, the point of law that we asked for, is unquestionably the law in Delaware. And what additional language did you ask for? We wanted language from the Delaware Supreme Court that where the fact of... Where liability has been proven and the fact of damages has been established, then damages do not need to be proven with precise certainty. And... Did she give a reason for why she didn't include that or she just heard the argument and then didn't include it? She gave no reason. She actually said, Oh, that's interesting. I'll consider it. I'm after that. But then she just... It was just absent from her final jury instruction. Part of the problem... Not problem. I mean, it is what it is. If this is error, maybe that's true of other errors here, but the whole thing has to go back and be redone, right? Well, it would be a limited trial just as to damages on count six. So rather than the five-week extravaganza we had, it would be, you know, maybe a few days. You know, I would think the experts would testify here, the damages. The jury would probably need some contextual testimony about what the... What happened. But it certainly wouldn't be... We wouldn't have all the Warren Act issues, the Dislocated Workers Act issues, the liability issues. It would be a much more focused trial as to this point. And again, it's... We've cited the Supreme Court cases from Delaware, the Delaware Chancery Court cases. What we wanted in the instruction is very clearly the law in Delaware. I don't think that could be disputed at all. And then the next question you go to is whether it materially affected the jury's outcome, which I also think it just is a matter of common sense, and the fact that the jury awarded damages, but only awarded nominal damages in this highly complex case with so many details. I want to move on from that point, unless you have any other questions on the jury instruction, and go on to what we have labeled issue number three. And this was the court's grant of judgment as a matter of law on count seven of the complaint, which was the allegation that Mr. Marinelli, who was affiliated with the Ellison defendants, breached his duty of loyalty by allowing Island assets... Islander to dissipate assets in his own self-interest. Again, the standard of review is the NOVO. The standard of review for granting a judgment as a summary judgment. It's drawing all reasonable inferences and plaintiff's favor that no reasonable jury could have ruled in front of plaintiff for plaintiffs. And here the court simply misunderstood the nature of the evidence with all due respect to the district court. And what the evidence shows, the jury, the court was focused on one date, which is July 10th, 2017, and her basis for dismissing... That's the date that Marinelli resigns. Correct. Correct, your dismissing this is... That's the date he resigned. After that point, he owed no fiduciary duties. So anything that happened after that is what we... is the basis for this claim. But that's simply incorrect. We allege facts and put on factual evidence that showed that the breach of fiduciary duty occurred before July 10th, 2017. I want to walk you through it about what happened in this... with this company. The theory of this count was that in June 2017, Island Air was hemorrhaging money. It was taking on massive debts, and every two weeks it was struggling to pay its employees. This was after a year and a half of consistent and excessive losses, and they were finally totally out of money. The record shows that in early July... in early June, Mr. Marinelli's recommendation to Mr. Ellison was we should not save this company. And Mr. Ellison wholeheartedly agreed. This is an email. It's ER 4779. That's in early June. At that time, Mr. Marinelli is also trying to sell these five aircrafts that another Ellison company owns, but are being maintained at Island Air, but Island Air is no longer flying them. So Mr. Marinelli is trying to sell these planes. They're not being flown. They're just sitting there, but Island Air is still maintaining them, doing the maintenance checks, keeping up their certificates. Then later in the month of June, after early June, where they say let the company fail if it fails, later in the month of June, they realized two things. One, Island Air really doesn't have the cash to continue operating. It's going to close down on June 20th. It can't make its payroll. There's no way. It's no other option. And two, if Island Air does go into bankruptcy, the value of those planes owned by Mr. Ellison, which Island Air is maintaining, is going to drop precipitously. And this is in the same email. It's a June 20th exchange between Mr. Marinelli and Mr. Ellison. And they do a complete 180. They completely change their tune. Instead of saying, it's okay, we'll let the company fail. Whatever happens, happens. They say, well, wait a minute. We need to put a little bit of money into this company to keep it going so it doesn't go out of business and the value of those planes drop. And this harmed, it was totally in their own self-interest. I mean, there's no question, nothing in that email exchange would imply at all that they did it because of any sense of fidelity for Island Air. We wanted to tell the jury or argue to the jury that this constituted a breach of the duty of loyalty. And it clearly harmed Island Air. I mean, the financial support to prop up Island Air was given on June 20th, 2017. And that quarter, ending on June 30th, 2017, Island Air lost $4.9 million. Drawing all inferences and points of favor, a reasonable jury certainly could have agreed that this was a breach of the duty of loyalty on the part of Mr. Marinelli. Your thought, if he had been a rational disinterested member of the board of directors, that he would have allowed Island Air to go ahead and file for bankruptcy in June? Correct. Our argument has been that at some point, significantly before July 10th, or at least in June 20th, they should have filed bankruptcy, done an orderly liquidation plan, stopped the taking on of massive new debts every month, and stopped the dissipation of the assets that were left. That's our theory. It was a breach of the duty of loyalty to allow that go on, and to allow that go on because of their own self motives to have that going on, as opposed to liquidating the company. I want to turn to the next issue, which is the issue of punitive damages and their availability under Delaware law. On this claim, our argument is that we should be able to ask, we should have been able to make a pitch to the jury for punitive damages on the count that we won, which was count six. It's purely a legal question. The standard of review is de novo. I just asked a question on this one, because as I looked at this, I was left with the impression that the Delaware Chancery Court bars punitive damages absence statutory authorization. So if that's true, where, I mean, do you agree with that sentiment, and if you do, where would you find this statutory authorization? Well, here's the argument. The Delaware Chancery Court bars punitive damages absence statutory authorization, but that does not mean Delaware law bars punitive damages on a claim brought in the Chancery Court, if it's brought in another court. Now, there's a split of federal authority on this, on the punitive damages. Some federal courts have said, we're not in Chancery Court, we think this is a type of claim Delaware law would allow punitive damages on, we're gonna allow punitive damages. Some federal courts have gone the other way. A couple other points I would make on this is... Help me understand that, though, because I don't understand the theory based on, I mean, you agree that you have to have statutory, if this was in Delaware Chancery Court, you'd have to have statutory authorization. So how could you say, just because it's in another court, I don't understand how those courts have ruled that way. I'll give you an example. We cited maybe three cases in our brief, Delaware cases, where they involve claims, tort claims, where there's no statutory authorization for punitive damages. They were brought in the Chancery Court, and the Chancery Court has said, all right, you've brought a fraud claim. We cannot award punitive damages on your fraud claim, even though, if it was brought in the Delaware Superior Court, you could get punitive damages. And we're saying that this claim is just like the fraud claim. I see. If you brought it in... You're saying, maybe I'm misunderstanding, but Delaware Chancery Court would effectively apply sort of a choice-of-law application and say, this isn't arising directly here, so we can do what another court would do. Correct. And that's what the federal courts have said. They've said, we're not in Chancery Court. The fundamental question is, does Delaware law... The problem with that argument is that you're never going to be outside of Chancery Court if it's tried in Delaware. Ever. If you're tried in Delaware State Court, that's true. But if you're in Delaware... Under Erie, if we do anything other than that in federal court, then we're opening the door wide to forum shopping. Well, I would... I think that you would have that... I don't think there's going to be forum shopping just because there's the ability to do that anyway, if you want to be in federal court for some other reason. Well, if you know that you're going to have this whole other category of damages available to you in federal court, but not in state court, then there's going to be every incentive for a plaintiff to not be in state court. And isn't that what Erie counsels against? Well, I... Because we're talking about a state law-based claim. I mean, you have that problem anyway, in some respects, with the jury trial. I mean, in Delaware... In Delaware Chancery Court, you don't get a jury trial. But if you were to remove those claims to Delaware District Court, if there was diversity jurisdiction or a federal question, you would get a jury trial on those same claims. And you've got a jury trial here. Correct. On the regular damages, just not the punitives. Correct. The problem is that if this entire case had been in Delaware Chancery Court, you wouldn't have gotten a jury trial, even as to the regular damages, much less the punitives. That's absolutely correct, Your Honor. It's really unusual. It's really an odd situation. Yes. And in order to say that Delaware law prohibits punitive damages, you would have to interpret the Delaware statutes making the Chancery Court the exclusive place for breach of fiduciary duty claims. It's also Delaware law somehow thinking that punitive damages are barred on fiduciary duty claims. But that is inconsistent with the whole body of Delaware Supreme Court law on tort claims, on similar types of claims. You know, it's a breach of duty of a lawyer, malpractice. Do you have any examples of a fiduciary duty claim being tried in Delaware Superior Court? I believe we cited one, but I don't want to. I can't give it to you. I remember seeing one, but it was just like an offhand comment, like a one-sentence throwaway. No citations, no analysis, no nothing. There was, I believe there is an example. I don't have it at the tip of my finger, so I apologize. That was my recollection, but if you've got anything, that's it. Yeah, if we got it, we would have cited two. I do recall that. Should that tell us something that is as important as Delaware is to corporate law, that no fiduciary claims seem to have been, a breach of fiduciary duty claims seem to be tried in Delaware Superior Court? Well, the reason for that, Your Honor, is because there is statutory delegation to the Chancery Court as the exclusive jurisdiction, but that doesn't address the issue of what happens where in federal court, where you have a whole different... Yeah, but at some point, at some point, the choice by the Delaware legislature to ship all of the fiduciary claims to the Chancery Court becomes part of its substantive law. It may look jurisdictional to us, and we're just very strictly categorizing it. I understand the argument, but at some point, it becomes a substantive choice. That is, if you go to Delaware, you know that the off-ramp takes you to Chancery Court, and that the punitives will not be available. Well, I disagree with you that it's necessarily a substantive choice, because the Delaware Chancery Court also has a completely different set of procedures as the Delaware Superior Court. It doesn't do juries. You get judges who are experts in corporate law, so the idea that they're shipping fiduciary duty claims to Chancery Court may have everything to do with process and procedure and having a specialty court, as opposed to... I mean, if Delaware really wanted punitive damages available for these kinds of claims, it has a statutory way of doing that, right? Well, I'm not aware of any common law tort claim. There may be some, but generally, when you read the Delaware Supreme Court cases, we've cited on punitive damages. Punitive damages are recognized by the Supreme Court, as opposed to by statute. So, we cited a case that says in Delaware that breach of fiduciary duty, or that breach of contract cases, unlike many states, you can get punitive damages in Delaware in certain circumstances. That was created by the Delaware Supreme Court and not by statute. I want to be mindful of my time. I do... Before you sit down, I think there's at least two other issues I'd like you to address. First of all, could you turn to the fiduciary duty of OHANA? Yes, on a question. Yes, Your Honor. One of our allegations, or one of our points of error, is the district court erred by finding that OHANA, from taking away from the jury, the question of whether OHANA and the Ellison Trusts owed fiduciary duties. And we offer two theories why that question should have been decided by the jury. One is a matter of corporate control, and we cited evidence that there was substantial control by OHANA as an owner, as a one-third owner, a major creditor of Island Air, that allowed it, that could have allowed the jury to find a basis that OHANA owed fiduciary duties. And there's a Delaware court case on this point called Voight, which held that a one-third owner, in that case, had fiduciary duties. The second theory is an agency theory, which is that Mr. Marinelli was no more than the agent of OHANA and the Ellison Trust when he was serving on the board of Island Air. Now, I recognize that being appointed to the board by another company does not necessarily, in and of itself, mean that you are that person's agent, because the other side will say that. But we are more than that. We're looking at Mr. Marinelli's own testimony, where he freely admitted, I'm here to represent Mr. Ellison's interests. I always represent the interest of all of his companies. So it wasn't, he didn't testify, I'm totally independent, I put that aside, and when I'm wearing my Island Air hat, I only wear my Island Air hat. He said, literally, or not literally, I'm paraphrasing, but close enough, I sit here on the board to represent Mr. Ellison's interests. And then last question I would, would you, that I have, is, would you address the question of the affirmative defense, the DWA? Yes, the defense, is that the defense? Yes. Yes, Your Honor. On this one, this is a strict question, a statutory interpretation. We're saying the defense does not apply as a matter of law, and the, the, the appellees are saying that the District Court got it right. And it's, it's purely a matter of statutory interpretation. And here are the points I would offer. The first point is, what the District Court, how it read the statute, was incredibly radical in the context of the statute as a whole. Nowhere in the Dislocated Workers Act will you find a complete defense to notice, where notice is otherwise required. When you, second, when you look at the wording of section, it's section 394 B 9 C, the wording clearly deals with the timing of notice in one particular context. It implies, the implication is that notice will be given, it just deals with the timing of that. So it is quite a leap in interpretation. Okay, I, I mean, I've read this statute over and over again. I've parsed it every which way I can. It's a, it's an odd statute. I, and so can you tell me what you think it means? What I think it means is, essentially what it says is, in the situation where there is a divestiture, and the divestiture is where a transfer, where there's a transfer of ownership, and this is very important, and that transfer of ownership results in layoffs. That's in the, that's in the definition of investiture. Where that happens, notice does not have to be given until the time there's a binding agreement. So in other words, the, the, the reason for that is because if a company's looking for a divestiture, if a company does indeed change hand and there are layoffs, and you're holding the owners or the company liable for it, it makes sense to not hold these new owners liable until the date they agreed to buy the company. So, but, but what did we do with that last phrase, that results in a divestiture? That seems to suggest that a binding agreement is not a sufficient condition. It has to go through. It has to close. Correct. I mean, my agree, that's my argument, is that in order for that exception to apply, the, you have to have a transfer of ownership that results in layoffs. Otherwise, it just doesn't apply. It's irrelevant. It only applies to where there is an actual divestiture, not this, this other situation where you just lay off employees because you closed down. So I guess, like, I'm trying to figure that out because it seems that you, and I think this is what happened here, right? You could, the jury found that there was, that Island Air was actively seeking a buyer, and then that didn't happen, and so it was closed. So what happens when you're in that scenario where you are actively pursuing the thing that triggers this statute? You're ultimately not successful, and your argument, I think, is, well, then this statute, this protection from notice, just never applies because you weren't successful in consummating a sale. How does that make sense? Because I read this as suggesting that you're trying to provide protection for the process of accomplishing a sale for the reason that you just stated a minute ago. Why would that vanish just because you weren't successful if you were actively trying to do it? See, I disagree with that point that you're, that, I mean, that is what they've argued is the intention of the statute. They've cited no legislative history at all that would back that up. I believe that the purpose of this is to protect the new from liability for not giving notice when the company was in the hands of the old buyer. So in other words, you come in and buy a company, and then 15 days later there are layoffs. You shouldn't have to give that notice 60 days earlier when you didn't even own the company. Yeah, but doesn't that work both, I mean, so that really assumes that the day that you enter into the binding agreement is the day that the divestiture happens and the transfer of ownership happens. And that likely wouldn't be true, it seems to me, where you would have a period of time before the actual transaction occurs. Yeah, I agree with you. There is going to be a period of time, but that's why this affects the timing. So in other words, if when the duty accrues for the new owner is the date of the binding agreement. So if you lay off employees 17 days later, then 17 days is the day you need to get, you know, the day you, if you're intending to lay off employees, the day the buyer needs to give notice is when he actually takes owner of the company. I think I agree with you that the statute likely is also intending to protect the new owner if a sale happens. But what I don't understand about the argument that you're making in this statute, that it also isn't trying to protect the existing owner in the scenario that I've laid out. Why isn't it both? It's because of the last words of the statute, which are that results in a divestiture. If you're just looking to, if you're going to, if you're looking to protect both the process and the new owner, you don't even need the terms that results in a divestiture. It could, they could be completely omitted from the statute. So the fact that those terms are in there implies strongly that it's only intended to apply in a situation where there actually is a divestiture. I mean, all of that, I think all of that makes a lot of sense. I don't know what to do with the word until, because that suggests the until seems to, is a temporal point that applies to an employer of a coverage establishment that is actively seeking a buyer. So when does that employer have to give notice? Well, our, you know, our argument, which we think is consistent with Hawaii employment law in general, is that the risk of loss is on the employer. In other words, if the employer is out there looking for a buyer and can't find one and then just closes shop, they shouldn't be completely exonerated. Well, but it says that an employer is, is actually, shall not be required to provide the notice until he's entered into a binding agreement. That results in a divestiture. But if he gives, enters into a binding agreement that results in a divestiture, then he doesn't have to give any notice. But when would he have to give notice under C? Well, I mean, the employer, the employer would need to give notice under C when there's a binding agreement of sale. And this is a question that would, would arise, by the way, if there was a divestiture, which didn't happen here. But the until I would, so I have a word instead of until would have been if. Yeah, that's why I'm saying this is a timing issue. And the word until means something. And whether it means that the just means until, until he's entered, he's entered into a binding agreement that doesn't result in a, in a divestiture. And then he better give, he better start giving the notice. Well, I close. Yeah, I mean, I mean, our argument is it just doesn't apply if there's no divestiture. So if there is a divestiture, you look at this and the until date is the date that says when notice needs to be. So somebody who's actively seeking a sale and otherwise meeting the first part of the statute better give notice anyways, because there's no guarantee a sale will actually happen. And if it doesn't actually happen, then they will have violated the law. And they wouldn't have known that from the outset because they were trying to put a sale together. That's our, that's what we think the Hawaii State Legislature intended. The statute is not much protection at all under that scenario. The statute is meant to protect the employees, not to protect the employers. And this, and because of that, I'm not sure I understand that. Because if that was true, then this provision wouldn't exist at all. Well, it's supposed to be a, because it's a statute that is supposed to protect the employees, we ought to narrow, read the exceptions narrowly, where there's an exception for the benefit of an employer, unless it says specifically, I mean, if the statute means that just looking for a buyer is enough, it would have been written radically differently. Anyone could just take their hand at it and write it in a couple of sentences that says, if you're looking for a buyer, you're protected. As long as you're in good faith looking for a buyer, that's all you really need to say. I would, I also need to make the point that as I think our, our dialogue has shown, this is a very difficult statute to interpret. The Hawaii Supreme Court, we have our motion to certify this question and the other questions regarding the statute of the Hawaii Supreme Court. We think this is such a close call with the statute, there's enough at stake, it affects enough people, it meets the arguments. I wanted to put that in rather than concede that point just by having this dialogue. I've gone, I'm a little surprised that you want to seek certification. I mean, that would be, you know, years long delay here. And you're okay with that? I'm okay with it, because I am confident, as confident as I can be, that the Hawaii Supreme Court would agree with my interpretation. And they're the ones that, who's, you know, I'm putting my, my money where my mouth is. I'm trying to think of the expression to show that this, this is the way I think the Hawaii Supreme Court would read the statute. And the reason I'm asking for it is because I think they'll agree with me. Okay, we'll still give you some time for rebuttal. Thank you, Your Honors. May it please the court. Good morning. I'm Peter Ito on behalf of Appellee's Cross-Appellants, the OWD defendants. As Judge Nelson indicated, this is a complicated case. There are many moving parts. It's gone on for the last eight years. This morning, I really want to focus on the issue raised by Judge Forrest. That's Issue 17 for the OWD defendants. And I want to explain to the court how Issue 17 for the OWD defendants then bleeds into Issue 15. But first, I want to, because the, the nomenclature here is important. The unions filed administrative expense claims. They didn't file proofs of claim. Why is that distinction important? Because both are treated differently under the Bankruptcy Code. Under the Bankruptcy Code, specifically Section 502, proofs of claim are deemed, presumptively deemed allowed until they're disallowed. In contrast, administrative claims under Section 503 are only allowed after notice and hearing. We do not believe, as we've argued in Issue 17, that this court has appellate... Counselor, can you help me out and tell me Issue 17? I'm just trying to kind of, like, what is the issue here? The issue here is that the amended judgment entered by the District Court did not dispose of all claims as to all parties. So you're going to the jurisdiction? Yes. So I want to ask, so our case law says that when we have jurisdiction under 1291 and not 158, which is where we normally are in bankruptcy cases, so this one is unique, when we're under 1251, 1251 applies the same in this, in the context of bankruptcy as it applies anywhere else. So what I've been trying to in terms of figuring that out is, where is my zoom lens focused, so to speak? Am I focused on the adversary proceeding and whether that is final, or am I focused on the bankruptcy case and whether that is final? Because under 1291, in every other context, we would have our lens zoomed out and we'd be looking at the entire case, the whole dispute. So in here, that would be the entire bankruptcy thing. What do you think the answer is there? Well, and your Honor said 1251 at first, but it's 1291. 1291, sorry. 1291. I think the focus has to be on the adversary proceeding. So, okay, what do you point me to to give me that answer? Well, I'll explain to you how we believe what's, well, what is the result? I mean, I want a hook in the law, right? Where's my hook in the law? Is there a statute? Is there a case? Is there something that answers that question of when we're under 1291, how do we look at a bankruptcy case? Well, I can't tell you exactly how you would look at the bankruptcy case in the context of 1291. 1291 says that this court has jurisdictions, a jurisdiction of appeals from all final decisions of the district court. And our argument here is that the underlying amendment judgment is not a final decision. A final decision as to what? So what hasn't been decided? What has not been decided is my client's counterclaims. We were allowed under the bankruptcy code as part of this adversary to object to and to seek the disallowance of the union's administrative claims. So these are the expenses. Yes, your honor. Are any of these tied to any of the issues that are before the court today? Yes. Well, then how can we ever get there? In other words, how can we decide the questions that have been put to us if we don't have final judgment because we don't know how much expenses will be attached after we decide these questions? You cannot. It's completely circular though. Well, you can't. Had the district court as part of its amended judgment decided our second and third counterclaims and had determined that the union's counterclaims should either be disallowed in their entirety, which if they were, we argued there would have been no liability. So the administrative expenses is something that is usually calculated. That includes, for example, the trustee's fees. Is that correct? The trustee's fees would be deemed an administrative... It's just one example. So we have the trustee's fees and that ordinarily would be decided by the bankruptcy court at the end of the whole shebang, right? To the extent there's a distribution and the trustee's fees would be determined based upon a variety of... Why would we want to have the trustee's fees determined now, then take an appeal, possibly reverse things, in which case the whole question of the trustee's fees is moot. Well, for this reason, your honor, how do you determine in counts four and five what the damages are when counts four and five are based upon administrative claims that haven't been allowed? I'm trying to understand that. So let me ask it this way. The administrative expense claims that we're talking about, why were they part of this adversary proceeding as opposed to just living back down in the bankruptcy court until this proceeding is done? There were two ways the administrative expense claims could have been decided. Under the local rules here in Hawaii, the unions could have filed a motion seeking approval pursuant to section 503 of those administrative expenses. That's the first way. The second way that the bankruptcy, the federal rules of bankruptcy procedure, allow us to do that, and that would be specifically Federal Rule of Bankruptcy Procedure 3007B. That statute, that rule says that when we file an adversary proceeding or when an adversary proceeding is pending, and in this case we bring a counterclaim that involves one of the enumerated claims that you can bring under bankruptcy code or Federal Rule of Bankruptcy Procedure 7001, you can attach to that an objection to a claim, which is what we did. We objected to those administrative claims specifically because they serve as the basis for the trustees' claims on counts four and five. The trustees' argument on count four and five is that my three clients, PacCap Aviation Finance, who I'll refer to as PAF, Malama Investments, and Jeffrey Al, are liable for exposing the bankruptcy estate to those administrative claims. Well, the exposure isn't the same thing as liability. So, we wanted in the context of this lawsuit those administrative claims to be decided. Here, the district court punted on that issue and said that those claims should be decided by the bankruptcy court. We don't believe that that was proper in the first instance, but we've also argued here on appeal that as a result of having done that, there's no way you can determine liability on counts four and five. That's our issue 15. There's no damage. What is the damage to the bankruptcy estate from administrative claims that haven't been allowed? It's theoretical. It's pure conjecture. There's no way you can liability because those claims haven't yet been decided, and that's why, as part of our counterclaims, we wanted those two administrative claims to be decided. I don't think it's... Counselor, if you're right, what would we do? You'd remand this case back to the district court. And? And tell her, tell the district court that our counterclaims two and three need to be decided. We put on evidence during trial with respect to those administrative claims. But those are now pending in the bankruptcy court. Well, they were filed in the bankruptcy court and the claims registered. That's correct, but they're not currently before the bankruptcy court for consideration. They were filed eight years ago this month. Eight years. They could have, they meaning the unions, could have gone in and sought to have those administrative claims allowed. So your perspective is that there's nothing left. So of the things that are left with the bankruptcy court now, there's nothing there that needs to be done to decide your counterclaims. Those can be decided now. Those can be decided within the context of the underlying action. Is the trustee going to counterclaims two and three were part of our, within the adversary? I'm trying to get a, is it a disputed point that the district court has what it needs to have to be able to decide these counterclaims or whether some of the parties think that there's things left with the bankruptcy court that influenced this decision? If there's any disagreement from the unions on that point, your honor, it's that they believe they need to go back and correct their administrative claims because they do not currently meet the exact. That's the mootness question. That's the mootness issue that the trustees counsel referenced, right? They do not meet the exacting standard under 503, which is the evidence that I elicited during the underlying trial for just that reason. They don't meet that standard, but that's also why we objected and sought the disallowance of those claims, which we were entitled to do. And we believe that it issue 15. So you said that this decision, your counterclaims impact counts four and five. Yes, your honor. So what if we ask the district court to certify finality as to all the claims except claims four and five, then what would happen? Do you still, do you still have a final decision there? If you certify under rule 54B, then we would have a final decision as to less than all the claims and maybe we could deal with everything but claims four and five. Potentially that could happen, but you'd still have claims four and five left to be decided. Right. That would go back to the bankruptcy court or it would go back to the, they would stay with the district court to finish these remaining steps. Some judgment would be made there. That wouldn't be our problem today is what I'm saying. And is that a mechanism to deal with this problem or not? Pause for a moment to think about that. I assume that that's possible, your honor, to do it that way. It doesn't seem practical in light of the many issues that are involved here. They should be resolved all at once and in this case should be allowed to proceed forward. I actually push back on that. It seems actually eminently reasonable given everything that's been done in this appeal right now. If there's an easy cure, then why don't we resolve that? This is 98% of the case. So why not resolve it? Why wait for the extra 2%? There's a sense that everybody understood that this was final. We may have a problem and we need to be careful about that, but it doesn't seem inefficient to proceed this way. We wouldn't object to that, having said that. I was going to reserve three minutes on our sir rebuttal. I don't see I have reached my time. Thank you. Thank you. Good morning. It may please the court. Aileen McGrath and I'm here on behalf of the Ellison defendants. And I recognize that the court has covered a lot of ground already this morning. I plan to start by focusing on the only issue that I think has come up so far that necessarily implicates the Ellison defendants is the discussion about the breach of fiduciary duty claim against Mr. Marinelli that the district court resolved on the basis of a judgment as a matter of law. The rest of the issues, of course, I'm happy to and I will address. But I do want to flag that all of those issues only arise as to the Ellison defendants if this court were to make certain other determinations adverse to us along the way. That would include the question of who's the employer and the fiduciary duty of Ohana. Correct. Ohana's fiduciary duties only spring that question only springs into effect if you were to reverse on the fiduciary duty claim against Mr. Marinelli and the affirmative defense to only matters if you think that Ohana was an owner under the D.W.A. And I want to be very clear to start with the claim against Mr. Marinelli. The district court understood full well what Plaintiff's claim here was and why it was necessarily predicated on the ATR transaction. So the ultimate sale of the airplanes that my friend on the other side was discussing, which took place after Mr. Marinelli left the board. On page 360 of the excerpts of record, the district court said plaintiff's theory is that Mr. Marinelli kept Island Air alive and out of bankruptcy because he wanted to sell those planes. The district court understood that. It also applied exactly the framework for determining whether that was, in fact, a breach of fiduciary duty claim that plaintiff's asked the court to provide. Both before the district court and in their first brief on this case, plaintiff's cited the Delaware Chancery decision in void, which looks at whether a transaction that's ultimately consummated after a director is no longer involved. And to be clear, we think that's the most generous framework that applies. We think that an even heightened standard applies to a director who's fully left the board as opposed to abstained from a transaction. That standard looks at whether the director effectively set that transaction in motion. Those are the exact words the plaintiff used both below and to this court in describing their theory. And the district court found that as a matter of law, no reasonable juror could conclude from the evidence that Mr. Marinelli proposed the transaction that resulted in the sale of the planes, controlled the outcome of that transaction, or influenced the board. All of that is the beginning and the end of a claim. I'm sorry, you said that Marinelli didn't propose the transaction and he didn't control it? He did not propose, control, or influence the board. How many people were on the board at this time? Three. This transaction occurred after Mr. Marinelli left the board. And I recognize that plaintiffs are trying. I also do want to give some additional context. I understand Mr. Kapowski used some context about emails, but I don't agree that those emails show a connection between the desire to keep Island Air afloat and the sale of the planes. I'm not going to get into that. I recognize that we're on J-Mall. At the same time, I think it's important to understand the theory here. The theory here was that Mr. Marinelli, at Island Air's request, agreed to two transactions in the summer of 2017. One, to infuse $50,000 to help Island Air get through a cash crunch that was preventing it from meeting payroll. Two, that he agreed, again at Island Air's specific request, to purchase $800,000 worth of spare airline parts, also to help the company through a similar cash crisis. Plaintiff's theory is that he did all of that because he wanted to sell the airplanes before Island Air entered bankruptcy instead of after, because those planes would be worth $1.5 million if that transaction happened first, even though ultimately that $1.5 million in excess value went right back to Island Air under the terms of the transaction as it was ultimately negotiated. The reason that plaintiffs are trying to distance themselves from the ATR transaction and focus back and forth on conduct that occurred before and after is that Mr. Marinelli was no longer director by the time that transaction occurred, so the district court correctly analyzed that transaction under that framework. And any claims about actions that Mr. Marinelli took that had the effect of keeping Island Air out of bankruptcy are the kinds of deepening insolvency claims that the Delaware Chancery Court has said don't give rise to a breach of fiduciary duty claim, including when plaintiffs couple them with the assertion that, well, those directors had a self-interested reason for keeping the company afloat. For all of those reasons, the district court knew well what this claim was about. It focused properly on the factors that matter, and plaintiffs haven't made any argument pointing to any evidence from which a reasonable juror could conclude otherwise. And unless the court has any questions about that, maybe I'll turn then to the questions that just might be raised about OHANA's relevance here. So OHANA could only be liable for a breach of fiduciary duty if Mr. Marinelli is liable. The claim is that Mr. Marinelli was either an agent of OHANA or that OHANA was effectively a majority and controlling shareholder. Neither of those circumstances is true. On the agency front, Delaware law is very clear that a director's fiduciary duties, when he's acting as a director on a board, do not flow back to his employer or to the company that appointed him to the board unless there's evidence showing that that entity has the legal right to control, the legal right to force his hand in terms of the actions that he takes on the board. The evidence that plaintiffs have pointed to here consists solely of the fact that Mr. Marinelli was loyal to Mr. Ellison. That is not enough to take this case out of the usual context that Delaware courts over and over again have said is not enough to impute fiduciary duties when an employer appoints an employee to the board. As to the actual control question as to OHANA, there was no evidence that OHANA could actually control the company. In fact, the – No, counsel, the Delaware cases have – the language is unusual because it says owner or controlling interest. And if controlling interest just means 51 percent, there's no reason to have owner. It's superfluous. On the DWA question now, we're – Yeah, but the whole question of control. And under Delaware law, Delaware has said that even if you have less than 50 percent, that you can be a controlling interest. It's the Elon Musk rule, the 800-pound gorilla. And Mr. Ellison certainly looks like he fits in that category. He probably would like to be considered the 801-pound gorilla. Maybe he would adhere to being the 799-pound gorilla. But he's certainly in that range of this is the big boy on the block. I actually don't think that's true, Judge Bybee. As a matter of the claims and the circumstances in this case, many of plaintiff's claims turn on the fact that they thought that Al defendants, by virtue of Mr. Al's control over the two other minority shareholders that comprised the owners of Island Air, that his domination in the district court made an express finding on this that I think is inconsistent with the idea that Ohana is, in fact, the owner. This is on page 57 of the excerpts of record that the Al defendants controlled the company because of Mr. Al's common relationship with those two entities. Plaintiffs haven't – of course, they haven't because that's the basis for their fiduciary duty damages claims against the Al defendants. They haven't challenged that determination. I don't see how – Ohana had the right to reacquire a 66% stake. Is that right? I don't think that's right. That's not right? I don't think that's right. Ohana had the right to acquire additional shares, but that wouldn't have changed the extent to which it could actually control the outcome of the board with respect to the questions at issue here, namely whether Island Air could continue operating. But did they have the right to acquire a 66% stake? I believe that the answer to that. I'm actually not sure about the answer.  My notes say that they could acquire a 66% stake at any moment for $12,000. I don't think that's true. My understanding is that Ohana had the ability, and I'm happy to correct this on rebuttal if it turns out that I'm misunderstanding, but I don't believe that Ohana had the right to obtain a numerical majority that would have given it control over the board. I also don't think that that's enough. Under Delaware law, the Voight case that plaintiffs talked to demands actual present control. And the mere fact standing alone of ability to obtain control, I don't think, changes that calculus. Well, that's not the only factor at play here. I mean, the other thing is that the Ellison side of this equation was where all the money was coming from. And courts say that we can look at sort of the influence that being the money holder has, even if you're not officially a member of the board. Well, prior to the fact – I don't think that was true after the Owl defendants entered the scene. Once Ohana sold its interest and became a minority shareholder, the money that was flowing into the company previously, that sort of course of conduct changed, and the Owl defendants had control. Here, too, I think what I've heard from my friend on the other side is that the Ellison defendants cut off that chain of funds. And so I don't think it can be – the findings that were made as to that – I'm not sure that they cut off that chain of funds does a whole lot because that was a choice that they made. And they could have made a different choice. And you can make that choice to try to influence behavior. And so isn't that – that sort of cuts towards the point I'm trying to make. I think that goes beyond what the Delaware Chancery Court or Delaware courts in general have recognized is sufficient to paying a minority shareholder who has a numerical minority and to hold them accountable on a control basis. Again, here, I think this only matters if there was an actual breach of fiduciary duty. You want to underline that. That could give rise to liability. But even if that were the case, I don't think that Ohana – that the evidence that was introduced as to Ohana's role in the company at the time that these allegations are focused on can give rise to that level of control. Unless there are more questions about Ohana, I don't want to spend too much of my time on punitive damages, again, because that's an issue that only matters for the Ellison defendants if the court were to reverse on the fiduciary duty claim. But it would matter a great deal to the Ellison defendants if we were going to reverse. Right. And so that is why I will say something about it, which is that I completely agree with some of the discussion, particularly the way that Judge Forrest was characterizing the issue, which is that as a matter of statute, the Delaware legislature has vested the court of chancery with exclusive jurisdiction over fiduciary duty claims. That court, as everyone agrees, lacks the power to award punitive damages. I don't see how there could be any basis to say that there is a source in Delaware law to find punitive damages as a matter of state law. And even if there were, how then that would not give rise to exactly the kinds of forum shopping principles that we've been discussing. And I think the analysis of this, both the source of power and the potential eerie implications, Judge Nathan spoke very clearly to this in the Buchwald decision that we cite, that allowing an additional remedy to be available, so not just a different procedure, but an additional remedy that would be available exclusively in federal courts, that strikes right at the heart of what eerie is supposed to prevent. And so even if you did think there was some ambiguity, and I don't think there is, about what Delaware recognizes as a matter of its positive law, I don't think that eerie, I think that the eerie factors very clearly suggest that there could be punitive damages available. I think there's much to commend itself in the Buchwald decision. The hard point for me here is that you've claimed the benefit of eerie as to the punitive, but as to the regular damages, we went ahead and allowed a jury here, which would not have occurred in Delaware. In other words, we allow a jury to decide regular damages, but not punitive damages, but both of those questions in Delaware would have to be decided by the Chancery Court. Well, in the Chancery Court, there would be no punitive damages. That's right, but the regular damages could not be decided by a jury. In other words, our forum shopping here would allow for a jury to decide damages when it would not in Delaware, just regular damages. I agree with that, Judge Rivey. I think that the difference between the availability of a jury trial right in one forum versus another is the quintessential kind of procedural difference that courts have said doesn't give rise to eerie, and that's because there's not going to be, there's a different procedure, and yes, maybe some parties will prefer a jury or not, but it's not going to be outcome determinative in the sense that you know, well, if I file suit in this forum, I'm going to be able to seek the sky's the limit in terms of what damages I can obtain as opposed to having to prove exclusively actual damages, which would be the case in Delaware law. Again, I think it goes back, I don't think there's any source of Delaware law to point to to say that this is available, but if it were, those would be all the negative ramifications that I think overcome it. I would like to turn back to the DWA questions. I'm happy to talk about the affirmative defense. I agree that the actively seeking a buyer language seems very clearly to me to suggest that there are protections given to entities that are actively seeking a buyer. This, too, is one of those issues that only matters for the Ellison defendants if you were to reverse on the threshold question of whether the Ellison defendants or OHANA specifically owned the company for purposes of the DWA. And to go back to what Judge Bybee said about the relationship among the statutory definitions the DWA defines an employer as an individual or entity that owns, operates, or has a controlling interest in a covered establishment. Both as to this issue, and I think this actually points to some of what I'm talking about in terms of the cross-cutting differences among plaintiffs' claims. Their exclusive basis for arguing that OHANA is an employer under the DWA is that OHANA owns the company by virtue of its one-third ownership interest. There's no argument in the briefs or anywhere else on this issue that says that OHANA exercised a controlling interest. The ordinary English language way of referring to an owner is someone who owns something completely. The ordinary plain English way of referring to a controlling interest includes entities that partially own a company but don't own it in its entirety and nonetheless control it. The district court applied the plain meaning interpretation of those two provisions. OHANA had a one-third minority interest. Plaintiff's argument, if it were true, would mean that not only one-third minority interest holders but any shareholder, I think plaintiffs are quite candid about this, that any minority shareholder, whether having a one-third or one-three-thousandth interest in the company, would equally be individually liable for that company's DWA notice and wage payment violations. That is not only an absurd result just as a practical matter. It's also a result that runs headlong into what the legislature actually said, which is that only entities with a controlling interest, not those with just any interest, are the employers under the DWA. I see that I've already gone into that. I would like to just very briefly touch on our cross-appeal issue, which is the equitable subordination question. And the problem with the district court's interpretation here is that the district court misapplied the standard for equitable subordination in three respects, all of which boil down basically to the fact that the district court found common features of bankruptcy cases. And that's, of course, the only context in which equitable subordination is ever going to arise to justify the heightened remedy of equitable subordination. Number one, the district court, despite recognizing that there are three categories of inequitable conduct that courts have recognized, there's fraud, illegality, and breach of fiduciary duty. There is use of the debtor as an instrumentality or alter ego. It is undisputed that neither of those is satisfied here. The third is undercapitalization. But the district court expressly declined to find that Island Air was undercapitalized at the time that the loans were extended. That should have been the end of the inquiry, but the court went on, and this is what I'm focusing on as well as on the third prong with respect to the court's focus on issues that are common in the bankruptcy context. The court said it was enough for it to find that Mr. Marinelli and therefore Carbon Veal, which is the entity that extended the loans, knew that Island Air was a risky enterprise. The fact in the bankruptcy context that the company would have been in financial peril is virtually always going to be true. That's why this court, and I would point the court to its filter corp decision, has said that equitable subordination is not appropriate even when insiders, just like Carbon Veal, extend loans to an insolvent corporation, even when they take steps to tie the security for those loans back to a time when the company was insolvent. To say that equitable subordination is warranted simply on the basis that a company was faced financial risks I think is exactly contrary to what the court has said there. If I could, I would like to reserve another minute for rebuttal on this issue, unless the court has other questions for me now. Thank you. We'll give you four minutes. I know you asked for 12. If you need more, you know. Thank you, Your Honor. There are a number of things I'd like to address, and we'll see how quickly I can do them. I'm going to start with equitable subordination because that is what went last. It's a highly factual inquiry. The district court looked at the totality of the circumstances, cited probably a dozen facts as to that inquiry. What they say is we would have to find clear error by the district court on these things. As to the fact-finding, I believe as to the ultimate decision, you would need to find abuse of discretion, but to the extent they're disagreeing with the facts, that is clear error. The standard is for an insider, and this is in the hedged investment cases they cite, is where a claimant is an insider or a fiduciary, the party seeking subordination needs to show some unfair conduct and a degree of culpability on the part of the insider. The cases they cite, as well as the Ninth Circuit Strombos case, make clear, you don't need a showing of illegality or common law fraud, which you would need if you're not an insider. And some of those cases, the Fabricators case and the Strombos case, find equitable subordination without making any findings of fraud or illegality. Moving on, I want to address Mr. Ito's claim, argument about the counterclaim that was dismissed without prejudice, because I want to give the court a fuller picture of just how academic an argument this is. And I should note that this issue that they raised, oh, the court can't hear this because there's still these pending proofs of claim in the bankruptcy court, is something they didn't raise until I've looked in the record. I think the court jurisdiction is the problem. I know, but it shows the strength of the argument, the fact that they waited so long to raise it. But here's the issue. The jury has valued those claims. They came up with a verdict to the penny of how much Island Air is liable to the unions. So when those claims are adjudicated in the bankruptcy court at the end of the bankruptcy case, and the trustee is really only taking the position that we're just doing what we do in the ordinary course, was these are bankruptcy court proofs of claim, administrative expense claims with a very similar process. It should just wait till the end of the bankruptcy case. But when you get there, we have numbers for those claims. And I believe it would be race judicata. Don't some of their arguments in the counterclaims sort of attack the basis for the calculation? Whether it should have happened at all? Now that we've had a jury, the attacks they make on those numbers are what we had a jury trial about, and then we got a number from the jury. Now, they're correct. It seems to me that you're trying to say there's really nothing to be done. There's really no there there. Don't worry about it. Yeah, there's no. If that's true, then why did the district court have to dismiss with prejudice and acknowledge that there are arguments left to be dealt with that the bankruptcy court can deal with? I believe that the district court was adhering to normal bankruptcy process, which is what we argued. It's like let these claims be adjudicated in the normal bankruptcy process rather than you doing it. If it were to go back in front of the bankruptcy court or in front of the district court to adjudicate those claims, I believe she'd have no choice but to follow the jury and say, okay, this is what the jury found those claims are worth. This is what they're worth. Counsel, if we disagree with you on this, what is the problem? As Judge Forrest had suggested, and we were talking to opposing counsel about just doing a limited remand, get a certification and coming back under that process. If you disagree with us on that, I would prefer that as opposed to. Sitting out and waiting for the whole thing to be done and coming back up again. Correct. And I would ask the limited remand not be a reversal of the jury's verdicts on counts four and five, but rather asking the court. No, I mean, it couldn't be. I mean, if we agree with your opposing counsel, then we would say we don't have appellate jurisdiction. So we couldn't do anything other than do a limited remand for purposes of creating a final, a true final judgment in some way. Yeah, I prefer that you treat the judgment as final. But the second best option would be a limited remand just on those two counterclaims, and then we could decide in the district. Well, hold on. I mean, you're saying a limited remand just to decide those, but we could even do it with an interlocutory appellate certification. Correct. I take it that would be your second option. Your third option would be fine, go back on a limited remand and just deal with these two remaining issues. Well, I mean, if you think that you need a limited certification from the district court on every issue but the two counterclaims, we could do that. But I don't know if that's necessary. I mean, if there's any mechanism to resolve everything else and remand on those two counterclaims, that would be certainly the preference. But, again, I mean, we've made the arguments. I won't reiterate why we think the judgment is final under the case law. If I may have a moment to address a couple of other issues. I want to address the count regarding Mr. Marinelli's breach of fiduciary duty and judgment as a matter of law being granted on that. This happened in the context of about half a dozen motions for judgment in that matter of law that were decided at once during trial. The district court simply overlooked some of our arguments here with all due respect. And it's clear from the complaints that we were arguing that breaches of fiduciary duty preceded his resignation. We said in the complaint, and this is paragraph 262, that the spare parts transaction, this was the June 20th transaction, which was entered into because they wanted to sell the planes, was a breach of fiduciary duty. The fact that the transaction to sell the planes was consummated afterwards is irrelevant. If they failed in this transaction and didn't sell the planes and Mr. Ellison lost money, he still breached his fiduciary duty by trying to do it before July 10th, by entering into these other transactions to keep Island Air going so that he could keep trying to sell the planes. That's the point. And I think if you read our complaint in our papers below, we've made that clear. It's not just conduct that occurred after his resignation. And the last point I want to touch on quickly is the idea of Ohana's control of Island Air. The plaintiff's theory here, and my colleague or my friend on the other side argued that, well, we argued that Mr. Au controlled Island Air, so therefore how could Ohana control Island Air? And what we argued was a little more nuanced. And what actually happened in the dynamics of the way this company operated was, Mr. Au certainly had day-to-day control over Island Air. He was a variable dictator at Island Air on a daily basis, except when Mr. Ellison wanted to get something done. And when he wanted to get something done, he spoke up through Mr. Marinelli and he always got it done. That's the control we had over the company. He wasn't interested in the day-to-day operations, but when he wanted something done to further his interest, he stepped in and it always got done. And that's enough to hold him also as someone who is either part of the control group or also has a controlling interest. In other words, it's not one over the other. And I wanted to set you the record where the stop warrants was, and that's 4739. Judge Bobby, you're correct. It allowed Ohana to take back two-thirds ownership for $12,000. That is correct, as a matter of fact. So how do we apply that? I mean, because their argument is, yeah, regardless, that's a potentially future controlling interest, but that's not a present controlling interest. How do we make that judgment? I mean, do we get into saying, well, $12,000, that's so nominal that this is just a sham thing? They don't technically have control, but if they ever really want control, they can have it immediately. What if that were $12 million? Would we then say, okay, there's no control because they would actually have to do something. They'd actually have to think about this. I don't think you have to make that determination because what we're asking for is for the jury to make that determination. You know, judgment was granted as a matter of law, saying that under these facts, there's no way that Mr. Ellison could have control. They could argue to the jury those points. That's who should decide it. Okay. All right. Thank you. Thank you very much, Your Honor. We'll start with Mr. Rubato. Thank you again, Your Honor. I wanted to respond to Mr. Kropowski's arguments on counts four and five, and this ties back into potentially sending those counts back to also determine my client's counterclaims, the second and third counterclaim. Mr. Kropowski said that on counts four and five, the jury found my clients liable to a specific dollar amount, to the penny. And counts four and five are based upon alleged damage caused by my clients to Island Air. This is the problem I have. What liability today does Island Air have to the unions? Zero. The estate is not on the hook for anything at all, which is why we argued on issue 15, there's no case or controversy. There is no case or controversy at all. There's been no injury to Island Air. Now, Mr. Kropowski can come back on behalf of the unions and say, well, the jury has already found liability. The problem with that argument is this. Throughout their first brief and their third brief, what do they say is the source of the liability on counts four and five? The union's administrative expense claims. Those have not been decided. So to come full circle, as I was sitting there and thinking about the question that your honors posed with respect to sending this back, have sort of a mini-trial on four and five to deal with our counts? Does the trustee have standing on counts four and five? We wouldn't even need to do a mini-trial. I mean, you're talking about the jurisdiction. We could just send this back and get an interlocutory certification. I mean, this is complicated enough that I just wonder why we don't do that. You've agreed we can do it. You've reluctantly agreed that a better alternative keeps us all in the same position. And the only question I pose there is there's no standing on counts four and five. There's no case for controversy. I don't have anything else to add. Thank you. Thank you. We'll give you two minutes. Thank you, your honors. I appreciate the extra time. And I recognize I'm just up here on cross-appeal. But if I could provide a citation in the record to follow up on my answer to Judge Bybee's question about the $12,000 and the stock warrants, I think ER 3205 to 3209 shows why those stock warrants would not have changed actual control because Ohana had the right to purchase only additional series A stock. Control over the board was defined by series. And so purchasing additional stock in the same series would have had zero impact on Ohana's actual control over the board. And I'll leave it at that for those purposes. But I think that citation is really important. That was ER 3205? 3205 to 3209. And these are cited on page 33 of our second brief in fuller context. And then on the ‑‑ unless the court has any other questions on that, I will focus just on the cross-appeal issue. And very briefly, that even if you disagree with everything I said before, you agree with what you heard from Mr. Kapowski about the inequitable conduct, the district court still made further independent errors about harm to creditors. The Stoombo's case that Mr. Kapowski referred to also makes clear that harm to creditors cannot flow exclusively from the fact that loans were secured. In fact, Stoombo's goes further and says that a finding of just generalized harm to creditors is not enough. Equitable subordination requires specific findings that there was harm to competing claimants. And that the loans are subordinated only to the extent necessary to remedy that harm to the disadvantaged claimants. The district court made no findings along those lines. In fact, the district court never made any findings about the predicate question of whether any other interest holders, any other unsecured creditors, excuse me, were in fact disadvantaged because the question of whether carbon views loans were entitled to priority turned on the value of the collateral that secured them. To the extent the value exceeded those collateral, they were unsecured and operated on the same level as any other set of competing claims. And unless the court has any further questions for me, I will end it there. I thank the court for its time. And I ask that you affirm, accept, and respect the equitable subordination determination. Thank you. Thank you to all counsel. This argument could have gone a lot of different ways. It went the best way possible. And that's because of your professionalism and your preparation. And that's very helpful to the court. So we thank you. And that concludes our arguments for the day. The case is now submitted. And we're in recess. All right.
judges: BYBEE, NELSON, FORREST